# EXHIBIT G

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

STEPHEN MUCCIO, individually and on behalf of all other similarly situated,

Plaintiff,

v.

USHEALTH ADVISORS, LLC,

Defendant.
_______________________________________/

CASE NO.: 9:22-cv-81436-DMM

**CLASS ACTION**

**<u>DEFENDANT USHEALTH ADVISORS, LLC'S MOTION TO DISMISS</u>**

Defendant USHEALTH Advisors, LLC ("USHA"), by and through undersigned counsel, hereby moves for entry of an Order dismissing Plaintiff Stephen Muccio's Class Action Complaint, and in support thereof states as follows:

**PRELIMINARY STATEMENT**

On July 1, 2021, just three days after the bill was presented to the Governor and two days after it was signed, CS/SB 1120 went into effect. This bill, which amended Fla. Stat. § 501.059 (the "Florida Telephone Solicitation Act" or "FTSA"), created a host of new obligations for persons making calls meeting the definition of a "telephonic sales call" under the statute. The new law also created a private right of action for statutory damages for anyone who, without having provided prior express written consent, received a "telephonic sales call" that, as is relevant here, "involves an automated system for the selection or dialing of telephone numbers," a concept that is never defined or explained in the FTSA or its legislative history.

Plaintiff alleges that over the course of six months, he received on his cellular telephone four text messages from USHA regarding health insurance coverage. Compl. at ¶ 11. In wholly conclusory terms that neatly line up with the language of the statute, Plaintiff alleges that USHA "utilized a computer software system that automatically selected and dialed Plaintiff's . . . telephone number[ ] . . . ." Compl. at ¶ 17. Plaintiff's Complaint should be dismissed as a matter of law for several reasons, not least of them being that the newly-enacted section of the FTSA under which Plaintiff is suing is unconstitutional.

First, Section 8(a) of the FTSA violates the due process clause of the Fourteenth Amendment and Florida's due process guarantee as unconstitutionally vague. In prohibiting the use of "an automated system for the selection or dialing of telephone numbers," the Florida Legislature never defined this term or concept. It is untenable to leave this level of uncertainty and no definite warning as to what exactly is prohibited, especially when the new private right of action chills the exercise of a protected constitutional right – free speech – by subjecting persons to lawsuits and significant potential liability in the form of statutory damages.

Second, Section 8(a) of the FTSA also violates the First Amendment and Florida's free speech guarantee. Section 8(a) singles out one specific type of call – a "telephonic sales call" about "consumer goods or services" – for unique treatment and obligations, burdening one type of call by content alone. This is a content-based restriction on speech that is presumptively unconstitutional and subject to strict scrutiny, a standard Section 8(a) cannot meet for a number

of reasons. Indeed, two closely analogous state laws in South Carolina and Arkansas have ***already been declared unconstitutional***. *See Cahaly v. Larosa*, 796 F.3d 399, 402 (4th Cir. 2015); *Gresham v. Rutledge*, 198 F. Supp. 3d 965 (E.D. Ark. 2016).

Third, since Plaintiff attempts to have Fla. Stat. § 501.059(8)(a) apply to interstate telemarketing allegedly placed by USHA, which is alleged to be a foreign corporation with a primary place of business in Texas, (Compl. at ¶ 2), the statute also violates the Supremacy Clause of the United States Constitution. The State's regulation of the use of autodialers in telemarketing is preempted by the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "TCPA"), and the regulations issued by the Federal Communications Commission ("FCC") thereunder regarding automatic telephone dialing systems ("ATDS"). As the FCC has determined, Congress intended for a uniform regulatory scheme, and Section 8(a) presents what appears to be a conflicting, more restrictive regulation about the use of autodialers.

Fourth, even if Fla. Stat. § 501.059(8)(a) is not invalidated as unconstitutional, Plaintiff fails to state a claim for relief. The Complaint alleges conclusions, but no facts sufficient to plausibly state the use of "an automated system for the selection or dialing of telephone numbers" in violation of Fla. Stat. § 501.059(8)(a). Far from plausibly stating the unlawful use of an automated system to text him four times in six months, these allegations are fully consistent with an independent insurance advisor manually typing and sending to Plaintiff four text messages sporadically over several months.

## STATEMENT OF FACTS

### A. Plaintiffs' Allegations

Plaintiff alleges that "[c]ommencing on or about January 2022, Defendant sent [sic] following telephonic sales call to Plaintiff's cellular telephone number," and he reproduces in his Complaint four such text messages. Compl. at ¶ 11. Except one of the "screenshots" of the four text messages contains date information of "Mon, Aug 16," (*id.*), which would suggest August 16, 2021 (which was a Monday), as August 16 was on a Tuesday in 2022. Also, this same "screenshot" was included in Plaintiff's Complaint in the prior action that he filed against USHA in April 2022, which USHA removed to this Court and Plaintiff voluntarily dismissed only a few days later. *See* Dkt. No. 1-2 at ¶ 11. Regardless, the "screenshots" show that the three other text messages were sent on January 11, 2022, February 14, 2022, and an unidentified date ("Today"). Compl. at ¶ 11. Plaintiff does not identify any other text messages, telephone calls, or any other

communications that he received from USHA. Plaintiff believes, however, that USHA caused similar text messages "to be sent to at least 50 individuals located in Florida." *Id.* at ¶ 13. Plaintiff alleges in wholly conclusory form that "[t]o transmit the above telephone sales text message calls Defendant utilized a computer software system that automatically selected and dialed Plaintiff's and the Class members' telephone numbers." *Id.* at ¶ 17.

**B. The FTSA**

The FTSA has been on the books for years, but was rarely the subject of litigation until recent amendments went into effect on July 1, 2021. Those amendments added certain written consent requirements and a private right of action, on the heels of which private suits predictably followed in droves. Specifically, on June 28, 2021, CS/SB 1120 was presented to the Governor, who signed it into law the next day. The bill went into effect two days later. CS/SB 1120, in pertinent part, amended two material provisions, adding a written consent requirement for telephonic sales calls and a private right of action:

> (8)(a). A person may not make or knowingly allow a telephonic sales call to be made if such call involves an automated system for the selection or dialing of telephone numbers or the playing of a recorded message when a connection is completed to a number called without the prior express written consent of the called party.
>
> (10)(a). A called party who is aggrieved by a violation of this section may bring an action to:
> 1. Enjoin such violation.
> 2. Recover actual damages or $500, whichever is greater.

A true and correct copy of the 2021 amendment to the FTSA is attached hereto as **Exhibit A**.

The FTSA thus regulates and creates potential liability for "telephonic sales calls" made using "an automated system for the selection or dialing of telephone numbers" without "prior express written consent." The phrase "automated system for the selection or dialing of telephone numbers," however, is not defined in the statute and has not been definitely interpreted.

**ARGUMENT**

**I. SECTION 8(A) OF THE FTSA IS UNCONSTITUTIONAL**

Section 8(a) of the FTSA, Fla. Stat. § 501.509(8)(a), is unconstitutional on several grounds. It violates due process by subjecting persons to liability – liability that in a class action has the high potential to be annihilative given the availability of significant statutory damages – for failure to comply with a vague and insufficiently forewarned requirement. It violates the

First Amendment and Florida's free speech guarantee by impermissibly restricting speech on the basis of content. And it is preempted by the TCPA and its regulations because it imposes an obstacle to the achievement of Congress's objective of ensuring a uniform regulatory scheme on telemarketers' use of autodialers.

### A. Section 8(a) of the FTSA is Unconstitutionally Vague

Both the United States Constitution and the Florida Constitution guarantee that no person shall have their life, liberty, or property deprived "without due process of law." U.S. Const. amend. XIV, § 1; Fla. Const. art. I, § 9.[1] Due process requires that a law that subjects a person to punishment or liability not be vague. "An unconstitutionally vague law invites arbitrary enforcement . . . if it leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case . . . ." *Beckles v. United States*, 137 S. Ct. 886, 894 (U.S. 2017) (internal quotations omitted). "[V]agueness arises when a statute is so unclear as to what conduct is applicable that persons of common intelligence must necessarily guess at its meaning and differ as to its application." *Indigo Room, Inc. v. City of Fort Myers*, 710 F.3d 1294, 1301 (11th Cir. 2013).

Section 8(a) provides that "[a] person may not make or knowingly allow a telephonic sales call to be made if such call involves an automated system for the selection or dialing of telephone numbers or the playing of a recorded message when a connection is completed to a number called without the prior express written consent of the called party." Fla. Stat. § 501.059(8)(a). Although the statute defines "telephonic sales call," "prior express written consent," and "called party," the statute nowhere defines what an "automated system for the selection or dialing of telephone numbers" means and thus fails to give the required notice of what conduct it is prohibiting. That creates an unsurmountable due process problem that precludes enforcement of Section 8(a).

#### i. The Test for Vagueness is Stringent Given the Chilling Effect on Speech, and Doubts Are Resolved Against the Legislature

A law fails to provide notice when it does not "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v.*

---

[1] "The due process protections afforded by the fourteenth amendment of the United States Constitution are the same as those provided by article I, section 9 of the Florida Constitution." *Bonavista Condo. Ass'n, Inc. v. Bystrom*, 520 So. 2d 84, 86 (Fla. 3d DCA 1988).

*City of Rockford*, 408 U.S. 104, 108 (1972). *See also Brown v. State*, 629 So. 2d 841, 842 (Fla. 1994) (similar). "The test is whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *Jordan v. De George*, 341 U.S. 223, 231-32 (1951). "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc*., 455 U.S. 489, 498 (1982). "[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Id.* at 499. *See also FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012) ("When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech."); *Smith v. Goguen*, 415 U.S. 566, 573 (1974) (holding the vagueness doctrine "demands a greater degree of specificity" when the statute affects speech protected by the First Amendment). Moreover, at least under Florida law, although there is a presumption of constitutionality for legislative enactments, "when there is doubt about a statute in a vagueness challenge, ***the doubt should be resolved in favor of the citizen and against the state***." *Brown*, 629 So. 2d at 843 (Fla. 1994) (emphasis added) (internal quotation omitted).

**ii. Section 8(a) Is Void for Vagueness**

Section 8(a) does not provide the required "definite warning" of what conduct it is prohibiting, especially when considering the law directly impacts USHA's exercise of its First Amendment rights and thus must pass a more stringent version of the vagueness test. There is no question that a "telephonic sales call" is a form of speech protected by the First Amendment. All nine members of the United States Supreme Court agreed that the TCPA's similar autodialer/"robocall" prohibition implicates the First Amendment.[2] Thus, Section 8(a) of the FTSA, an analogous provision, regulates speech, specifically speech made using a certain device: an "automated system for the selection or dialing of telephone numbers." Accordingly, "a more stringent vagueness test should apply." *Vill. of Hoffman Ests.*, 455 U.S. at 499.

---

[2] *See Barr v. Am. Ass'n of Pol. Consultants, Inc*., 140 S. Ct. 2335, 2347 (U.S. 2020) ("*AAPC*"); *id.* at 2356 (Sotomayor, J., concurring); *id.* at 2357 (Breyer, J., concurring in part and dissenting in part);; *id.* at 2363 (Gorsuch, J., concurring in part and dissenting in part).

Section 8(a) cannot satisfy that test, especially with doubts to be resolved against the State. The FTSA has no definition ***at all*** for what is meant by "automated system for the selection or dialing of telephone numbers" to guide compliance efforts by those engaged in (or might be accused of engaging in) telephonic sales calls or by courts. In contrast, the analogous federal law, the TCPA, regulates all calls made using a specific type of device known as an ATDS. When it enacted the TCPA, Congress provided a very specific definition for an ATDS: "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1).

The legislative history for the FTSA bears no evidence as to how Section 8(a)'s language was selected or what it means. Indeed, prior to the July 1, 2021 amendments, the FTSA actually used varying phrases throughout the statute to describe the same prohibited technology. The pre-amendment version of the law read:

> (8)(a) No person shall make or knowingly allow a telephonic sales call to be made if such call involves an ***automated system for the selection or dialing of telephone numbers*** or the playing of a recorded message when a connection is completed to a number called.
>
> (b) Nothing herein prohibits the use of an ***automated telephone dialing system*** with live messages if the calls are made or messages given solely in response to calls initiated by the persons to whom the ***automatic calls*** or live messages are directed or if the telephone numbers ***selected for automatic dialing*** have been screened to exclude any telephone subscriber who is included on the department's then-current "no sales solicitation calls" listing or any unlisted telephone number, or if the calls made concern goods or services that have been previously ordered or purchased.

Fla. Stat. § 501.059(8)(a) & (b) (effective July 1, 2018 to June 30, 2021) (emphases added).

The recently adopted amendment dropped former subsection (8)(b), and thus the prefatory statement notes that the amendment "remov[es] provisions authorizing the use of certain *automated telephone dialing systems*," but uses *yet another* phrase, "automated dialing," in the prefatory statement. *See* Ex. A at 1 (emphasis added). It is unclear if all these phrases referred or refer to the same equipment and, if so, what that equipment is. There is no pertinent judicial authority that the Legislature could have conceivably adopted, and the legislative history for the 2021 amendments only adds to the confusion. The legislative history notes that the TCPA regulates "the use of autodialers" and then goes on to refer to the TCPA's express definition of *an ATDS* as an "autodialer." *See* **Exhibit B** (Mar. 25, 2021 Bill Analysis and Fiscal Impact

Statement) at 2-3 & n.4; **Exhibit C** (Apr. 19, 2021 Bill Analysis and Fiscal Impact Statement) at 2-3 & n.4. Moreover, the legislative history states that "automatic telephone dialing system[s]" are "referred to as an autodialer . . . ." Ex. B at 2; Ex. C at 2.

This legislative history then refers to the specific technology regulated by the language of Section (8)(a), ***too***, as an "autodialer": "Section 501.059(8), F.S., prohibits solicitations via telephone calls, text messages, and direct-to-voicemail transmissions if the communication is initiated with an automated system that selects or dials the telephone numbers (autodialer), or if the communication plays a recorded message upon connection with the consumer." Ex. B at 5; Ex. C at 6. That would appear to equate the prohibited technology with an ATDS as defined under the TCPA, as that was expressly labeled an "autodialer" earlier. *See* Ex. B at 5 & n.4; Ex. C at 6 & n.4. These portions from Exhibit C, with highlights, are excerpted below:

> [4] An "automatic telephone dialing system" or "autodialer" is equipment that has the capacity to produce or store phone numbers using a random or sequential number generator, and to call those phone numbers. 47 U.S.C. § 227(a)(1).

> *Automated Dialers and Recorded Messages*
> Section 501.059(8), F.S., prohibits solicitations via telephone calls, text messages, and direct-to-voicemail transmissions if the communication is initiated with an automated system that selects or dials the telephone numbers (autodialer), or if the communication plays a recorded message upon connection with the consumer. Autodialed calls and recorded messages are permitted if (1)

So, is an "automated system that selects or dials the telephone numbers" the exact same as an ATDS as defined by the TCPA because they are both "autodialers"? The legislative history contains no other discussion of what qualifies as or what was meant by "an automated system for the selection or dialing of telephone numbers." There are thus two options. One, "an automated system for the selection or dialing of telephone numbers," which is expressly referred to in the legislative history as an "autodialer," is intended to be coextensive and synonymous with the TCPA's definition of an ATDS, which the legislative history also defines as an "autodialer," making the two concepts equivalent. Or, two, it means something else. But what? There is no basis by which any person potentially subject to (or applying) the law could make any kind of determination as to what type of technology falls within the meaning of the statute. Persons subject to the statute (and courts) are left with nothing to do but guess at what technology and conduct the statute prohibits. That would be an untenably and unconstitutionally vague prohibition that could be applied only in arbitrary fashion.

It is therefore unclear what "automated system for the selection or dialing of telephone numbers" means if not the same as an ATDS under the TCPA. Prior to the July 1, 2021

amendment, the FTSA did not even consistently use the same language to describe this technology. The legislative history suggests, if anything, that this phrase mirrors the ATDS definition under the TCPA. This uncertainty raises profound First Amendment concerns as the natural result is a chilling of speech as persons cannot know if their business solicitation calls or text messages (even to existing customers) utilize a system that falls within the scope of the prohibited technology. Section 8(a) leaves no measure by which a speaker could, in advance, determine whether the technology they use to send a text message qualifies as an "an automated system for the selection or dialing of telephone numbers," whatever that means. That is an unacceptable denial of due process given the strict penalties imposed in the form of statutory damages of up to $500 per call, which could be trebled, (Fla. Stat. § 501.059(10)(a) & (b)), in lawsuits brought by private claimants individually and *potentially* on behalf of a class (which could lead to judgment for millions of dollars, and if the class is large enough, tens or hundreds of millions of dollars).[3] In light of not only the impact on protected speech, but also the significant liability that may attend violations of Section 8(a), due process requires a far more definitive warning of what conduct is prohibited by the statute.

The vagueness inherent in Section 8(a) and the phrase "automated system for the selection or dialing of telephone numbers" cannot survive the stringent test that must be applied given its deleterious effect on protected speech. As in *Fox Television*, which concerned 18 U.S.C. § 1464's regulation of "obscene, indecent, or profane language," there is not "sufficient notice of what is proscribed" by Section 8(a). 567 U.S. at 254. Florida courts have stricken statutes that similarly lacked the definite warning and required one to guess whether they were violating or in compliance with a law, including on concepts or subjects that were far less technical and seemingly better suited for a common understanding. For example, in *Barker*, the court found a statute that prohibited public officials from receiving gifts an official knows or, "with the exercise of reasonable care, should know," was given to influence him or her, (Fla. Stat. § 112.313(4)), was void for vagueness because "[t]he phrase 'should know' does not adequately define what is lawful or prohibited conduct" and "[r]equir[es] public officials to guess at whether or not the ethics code has been violated . . . ." *Barker*, 654 So. 2d at 648-49.

[3] This concern is hardly imagined or conjectural. Judgment was recently entered against a company in a TCPA class action for over $267 million, and attorneys' fees in excess of $89 million were awarded. *See Perez v. Rash Curtis & Assocs.*, No. 4:16-CV-03396-YGR, 2020 WL 1904533 (N.D. Cal. Apr. 17, 2020).

In *Weeks v. State*, 146 So. 3d 81 (Fla. 1st DCA 2014), *aff'd on other grounds*, *State v. Weeks*, 202 So. 3d 1 (Fla. 2016), the First District held that a law making it a crime for a convicted felon to possess a "replica" of an antique firearm, (Fla. Stat. §§ 790.001(1) & 790.23(1)), was unconstitutionally vague "given the multiple meanings which may be assigned to the term replica . . . ." *Id.* at 82-83. In *Brown*, the Florida Supreme Court declared unconstitutionally vague Fla. Stat. § 893.13(1)(i), which imposed enhanced penalties on those who sell, purchase, manufacture, deliver, or possess controlled substances within 200 feet of a public housing facility, because the term "public housing facility" was vague. 692 So. 2d at 843.

The same principle applies here, if not in stronger terms. A person subject to Section 8(a) is given no notice as to what conduct is prohibited. Unlike the TCPA's express definition of an ATDS, the FTSA employs a phrase without any prescribed meaning in statutes or case law and without any common understanding. Nor is there a standard for a judge or jury to be able to determine whether the technology or system used qualifies as an "automated system for the selection or dialing of telephone numbers." What qualifies as automated? What is automated selection? What if the number that was next in the queue of pre-loaded numbers was selected by the text messaging software – is that automated selection? What if no messages could be sent without the assistance or actions of a human being? And what is automated dialing in the context of a text message? What if the sender clicks on a saved contact (or a group of saved contacts) and presses a button to send – or "dial" – the text message, rather than typing out each digit in the telephone number(s)? What if they ask Siri or Alexa to send a message? Or if a person using their cell phone for their business uses an auto-response or delayed delivery feature, something Plaintiff appears to expressly allege constitutes a violation of the FTSA? *See* Compl. at ¶¶ 22-23.

As the above-cited courts explained, the lack of any clear guidance and definite warning allows for the exact kind of arbitrary and discriminatory application of the law that violates the Due Process Clause of the United States and Florida Constitutions. A speaker cannot determine in advance whether a telephonic sales communication will violate the FTSA and is left with the options of limiting their speech or risking potentially substantial statutory damages upon an arbitrary determination of liability. That situation is untenable and a violation of due process, especially when the language at issue covers everyday technology. Plaintiff contends in conclusory fashion that the text message he allegedly received was sent using "a computer software system that automatically selected and dialed Plaintiff's . . . telephone number[ ]."

Compl. at ¶ 17. There is seemingly no distinction between such technology and standard smartphone technology, as described above or as used for group text messaging. A group text message chain would also seem to use a system that runs afoul of Section 8(a) as Plaintiff is alleging here, since no one sending a group text message (or even an individual text) "manually dials" phone numbers. A message to a family text chain encouraging family members to visit a restaurant or store, especially one's own, could thus very well be unlawful because no normal acquaintance obtains prior express written consent before communicating. And, again, the litany of everyday uses of messaging and telephone technology described above appear to utilize automated selection or dialing of telephone numbers.

This is a variation of a problem that substantially motivated the D.C. Circuit to reject the FCC's interpretation of the TCPA's definition of an ATDS as overly expansive. *See ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687, 695 (D.C. Cir. 2018). The court flatly rejected the FCC's interpretation of the TCPA's definition of an ATDS that would sweep in basic smartphone calling and texting technology. *Id.* at 697. The D.C. Circuit reasoned that "[i]t cannot be the case that every uninvited communication from a smartphone infringes federal law, and that nearly every American is a TCPA-violator-in-waiting, if not a violator-in-fact." *Id.* at 698. The Supreme Court likewise rejected a different proposed interpretation of the ATDS definition because it "would capture virtually all modern cell phones" and "[t]he TCPA's liability provisions, then, could affect ordinary cell phone owners in the course of commonplace usage, ***such as speed dialing or sending automated text message responses***." *Facebook*, 141 S. Ct. at 1171 (emphasis added). Plaintiff has no difficulty in alleging that the latter is a violation of the FTSA, (Compl. at ¶ 23), giving the vaguely written FTSA the "eye-popping sweep" that was forbidden in *ACA*. 885 F.3d at 697. The D.C. Circuit explained that kind of ambiguity about whether standard smartphone technology was within the sweep of a law was unacceptable: "any uncertainty on that score would have left affected parties without concrete guidance . . . even though the issue carries significant implications—including the possibility of committing federal law violations and incurring substantial liability in damages—for smartphone owners." *ACA*, 885 F.3d at 699.

The FTSA cannot be allowed to visit similar due process violations. Section 8(a) is void for vagueness and unconstitutional. Plaintiff's claim must therefore be dismissed.

**B. Section 8(a) of the FTSA Is an Unlawful Content-Based Restriction of Speech**

In addition to violating due process, Section 8(a) of the FTSA also violates the First

Amendment and Florida's free speech guarantee by restricting speech based on the content of the communication. *See* U.S. Const. amend. I; Fla. Const. art. I, § 4. Section 8(a) regulates *only* "telephonic sales calls." *See* Fla. Stat. § 501.059(8)(a). That term is defined as "a telephone call, text message, or voicemail transmission to a consumer for the purpose of soliciting a sale of any consumer goods or services, soliciting an extension of credit for consumer goods or services, or obtaining information that will or may be used for the direct solicitation of a sale of consumer goods or services or an extension of credit for such purposes." The FTSA thus indisputably singles out a certain type of speech (commercial speech to consumers) for burdensome treatment.

The First Amendment applies to the States through the Fourteenth Amendment. *See, e.g.*, *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).[4] If a law is content-based – that is, it "target[s] speech based on its communicative content" – it is "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* The Supreme Court recently reiterated in *AAPC* that "a law is content-based if a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys," including by "focus[ing] on whether the caller is speaking about a particular topic." 140 S. Ct. at 2346, 2347.

Section 8(a) of the FTSA is a content-based regulation of speech. It singles out a specific type of speech – telephonic sales calls – and subjects *only* these calls to specific and onerous regulation. All other types of calls, informational calls, debt collection calls, business to business calls, etc., can be made using "an automated system for the selection or dialing of telephone numbers," whatever that means, without violating the statute. Indeed, Section 8(a) of the FTSA does not require consent at all for non-telephonic sales calls. Thus, Section 8(a) "is about as content-based as it gets. Because the law favors speech made for [non-telephonic sales calls] over [all] other speech, the law is a content-based restriction on speech." *Id.* at 2346. As a result, Section 8(a) of the FTSA is subject to review under strict scrutiny. *See* 140 S. Ct. at 2347; *Reed*, 576 U.S. at 163.

Section 8(a) cannot survive strict scrutiny. Content-based restrictions like Section 8(a) are presumptively unconstitutional and can survive only where "the government proves that they

[4] The First Amendment is coextensive with the Florida Constitution's free speech guarantee. *See, e.g.*, *Cafe Erotica v. Fla. Dep't of Transp.*, 830 So. 2d 181, 183 (Fla. 1st DCA 2002). Accordingly, USHA does not separately discuss Florida law.

are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. This is an exceedingly difficult standard to overcome. "In the ordinary case it is all but dispositive to conclude that a law is content based and, in practice, viewpoint discriminatory." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011). It is the State's burden to satisfy strict scrutiny. *See, e.g.*, *Reed*, 576 U.S. at 172. Here, it is unclear from the legislation and legislative history exactly the motivation for Florida's decision to regulate telephone solicitation calls by restricting the use of "automated system[s] for the selection or dialing of telephone numbers." Fla. Stat. § 501.059(8)(a). The legislative history simply identifies unwanted calls generally as a source of consumer complaint. *See, e.g.*, Ex. B at 2; Ex. C at 2. That only highlights the problem with the regulatory scheme adopted because statutes that are underinclusive fail the strict scrutiny analysis just as overinclusive statutes do. *See, e.g.*, *Reed*, 576 U.S. at 172.

If the State's view is that telephonic sales calls are particularly harmful, Section 8(a) is not narrowly tailored to address that concern. It still allows "telephonic sales calls" if they are not made with "an automated system for the selection or dialing of telephone numbers . . . ." Moreover, the definition of "telephonic sales call" is itself fundamentally flawed, exempting calls that do not concern "consumer goods or services," (*see* Fla. Stat. §§ 501.059(1)(c) & (j)), meaning calls pertaining to debt collection or business or trade goods are still permitted. Nor could the State have logically been concerned with the use of "an automated system for the selection or dialing of telephone numbers or the playing of a recorded message." Section 8(a), by its own terms, allows for any non-consumer sales calls to be placed using the identical technology that is unlawful only for particular speech. This permits, for example, "autodialed" debt collection calls, a particularly common subject of complaints concerning automated calls.[5]

Finally, any concern the State had in the placement of calls without prior express written consent is belied by the fact that Section 8(a) itself permits a wide swath of calls to be placed without prior express written consent. Again, debt collection calls could be placed without any

---

[5] *See* FCC, *Report on Robocalls*, CG Docket No. 17-59 at ¶ 14 (Feb. 2019) ("More than half of the top 20 spam callers identified by YouMail are categorized as debt collection callers."). As Justice Gorsuch observed in rejecting the protection of consumer privacy as a compelling interest that could justify the content-based restriction in the TCPA because calls to collect government debt were still permitted, "consumers seem to find debt collection efforts particularly intrusive: Year after year, the Federal Trade Commission receives more complaints about the debt collection industry than any other." *AAPC*, 140 S. Ct. at 2364 (Gorsuch, J., concurring in part and dissenting in part).

consent. Conversely, a telephonic sales call could not be placed *even if* the consumer *wanted* the call if the consent the consumer provided did not meet the statute's onerous defined standard for "prior express written consent." *See* Fla. Stat. § 501.059(1)(g). Even telephonic sales calls that are expressly defined as *not* being "unsolicited telephonic sales calls," such as calls made "[i]n response to an express request of the person called" or "[t]o a person with whom the telephone solicitor has a prior or existing business relationship," and thus are not subject to certain other restrictions in the FTSA, (*see* Fla. Stat. §§ 501.059(1)(k), (2), (3), (4)) – are subject to the Section 8(a)'s requirement of prior express written consent. There in fact seems to be little if any rationale to prohibit *expressly requested* calls just because those callers cannot satisfy the statute's onerous prior express written consent definition. In this regard, the statute is in fact *overinclusive*, prohibiting calls to which the consumer *wants* where *written* consent is not obtained.

These are not imagined problems. The First Amendment risks posed by this statute were abundantly clear to the State. At least two Senate committees recognized the potential First Amendment problems, including one committee citing the Supreme Court's then-just issued *AAPC* decision. Both committees issued committee reports highlighting that the regulations raised First Amendment concerns. *See, e.g.*, Ex. B at 8; Ex. C at 9. The end result of Section 8(a)—covering solely (i) telephonic sales calls, (ii) placed using a vague "automated system" and (iii) without prior express written consent—simply does not track with any concern in addressing unwanted calls or even consumer privacy. At most, it addresses an extremely narrow subset of that concern for telephonic sales calls and simultaneously contravenes that concern entirely by disallowing *requested* calls where the mandated written consent is not obtained. In the words of the United States Supreme Court, the "distinctions fail as hopelessly underinclusive." *Reed*, 576 U.S. at 171. And, as it relates to *consented-to* calls, including calls made pursuant to an *existing business relationship* or the *express request* of the called party, but where consent does not meet the onerous statutory definition of prior express written consent, the statute is fundamentally overbroad, unduly chilling *desired speech* ***based solely upon its content***.[6]

---

[6] The problem of underinclusiveness by the State in attempting to serve a compelling state interest by restricting only telephonic sales calls pervades the statute generally. If the State were genuinely interested in protecting its citizens from unwanted calls, then all calls would be barred to consumers who have requested not to receive calls. Nevertheless, only telephonic sales calls and limited other calls are barred in these instances, leaving debt collectors and the like free to continue placing these calls. *See, e.g.*, Fla. Stat. §§ 501.059(4) & (5). And, inexplicably, only persons making telephonic sales calls are barred from

At least two closely analogous state laws have already been stricken down as unconstitutional. In *Cahaly v. Larosa*, the Fourth Circuit invalidated a similar South Carolina law. *See* 796 F.3d 399, 402 (4th Cir. 2015). South Carolina prohibited "unsolicited consumer telephone calls" and calls of a political nature. *Id.* "Consumer telephone call" was defined in nearly *identical* fashion as "telephonic sales call" is defined in the FTSA. *See* S.C. Code § 16-17-445. The plaintiff was arrested for making political calls in violation of the statute. *Cahaly*, 796 F.3d at 404. The Fourth Circuit applied strict scrutiny, striking down the statute in part on the basis that "the statute suffers from underinclusiveness because it restricts two types of robocalls—political and consumer—but permits 'unlimited proliferation' of all other types." *Id.* at 406.

Another very similar law was invalidated in federal court in Arkansas for nearly identical reasons. *See Gresham v. Rutledge*, 198 F. Supp. 3d 965 (E.D. Ark. 2016). Like *Cahaly*, the Arkansas law prohibited the use of an autodialer to place calls offering goods or services or in connection with a political campaign. *Id.* at 968. In response to three rationales offered by the state – protection of automated call recipients from unwanted speech or intrusions in the home and preventing the seizure of phone lines – the court found strict scrutiny was not satisfied because "[e]ven if those privacy interests were compelling, they would not save the statute because it is not narrowly tailored with respect to them." *Id.* at 970. The court pointed out that the identical interests would apply to *all* calls and not just commercial and political calls. *Id.* at 971. In short, "[i]f the interests of privacy and safety warrant restriction of automated calls made for a commercial purpose or in connection with a political campaign, they also warrant restriction of other types of automated calls. The statute is underinclusive." *Id.* at 972.

Complying with the First Amendment is not an impossible task for a law of this nature. Laws against the use of autodialers that are aimed at serving similar interests but in a ***content-neutral manner*** do not violate the First Amendment in the way the FTSA does. *See*, *e.g.*, *AAPC*, 140 S. Ct. at 2355 (explaining that, with the exemption for calls to collect or enforce government debt severed, the ATDS prohibition constitutionally applies to all robocalls to cell phones). Section 8(a) of the FTSA, however, is fundamentally flawed for the exact same reason as identified in *Cahaly* and *Gresham*. Rather than barring autodialed calls generally (as the TCPA does) or even unwanted autodialed calls from strangers, it regulates exactly *one subset* of *one type* of call,

---

altering their voice to commit fraud, a concern that one would think would apply to any telephone call. *Id.* at § 501.059(8)(c).

telephonic sales calls concerning consumer goods. The State favors not only non-sales speech, but also sales speech for non-consumer goods. Because there are less restrictive alternatives to protect against unwanted calls and privacy concerns, the failure of the State to narrowly tailor its statute to a compelling state interest renders Section 8(a) unconstitutional. The law is fundamentally under- and overinclusive, doing little more than imposing a unique burden on a select type of message with the heavy-handed imposition of statutory damages. That is unconstitutional.[7]

**C. Section 8(a) Is Pre-Empted by the TCPA and Its Regulations**

Even if Section 8(a) were otherwise constitutional, it is still unenforceable because, with limited exceptions that do not apply here, the TCPA and its regulations preempt any law by a state that aims to regulate interstate telemarketing practices, including but not limited to the use of autodialers. The State of Florida's attempt to do so is therefore unconstitutional under the Supremacy Clause of the United States Constitution. *See* U.S. Const. art. VI, cl. 2.

Preemption of state law may be express, implied, or otherwise "inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." *Hillsborough County v. Automated Medical Labs*, 471 U.S. 707, 713 (1985). "An assumption of nonpreemption is not triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 90 (2000).

"Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose." *Altria Group, Inc. v. Good*, 555 U.S. 70, 76 (2008) (citation omitted). The TCPA provides that except for certain technical standards and do-not-call database regulations not at issue here, "nothing in this section or in the regulations prescribed

[7] Finally, Section 8(a) would also fail intermediate scrutiny if that standard were to apply. Intermediate scrutiny requires that the statute be "narrowly tailored to serve a significant governmental interest." *AAPC*, 140 S. Ct. at 2356–57 (Sotomayor, J. concurring). "There must be a fit between the legislature's ends and the means chosen to accomplish those ends. . . . [T]hese standards ensure not only that the State's interests are proportional to the resulting burdens placed on speech but also that the law does not seek to suppress a disfavored message." *Sorrell*, 564 U.S. at 572. The statute is by no means narrowly tailored. Despite attempting to regulate telephonic sales calls, Section 8(a) regulates only a limited subset of such calls and only when made with certain, vaguely described equipment. It prohibits consented-to speech where onerous prior express written consent is not obtained. There is little fit between the interest in avoiding unwanted calls and the means chosen through Section 8(a) to accomplish that ends. Thus, as in *AAPC*, even if Section 8(a) were to be judged under the less stringent standard of intermediate scrutiny, it would fail that test, too. *See AAPC*, 140 S. Ct. at 2356–57 (Sotomayor, J. concurring)

under this section shall preempt any State law that imposes more restrictive intrastate requirements or regulations on, or which prohibits," among other things, "the use of . . . electronic devices to send unsolicited advertisements; the use of automatic telephone dialing systems; . . . or the making of telephone solicitations." 47 U.S.C. § 227(f)(1).

Although courts have found that this language does not necessarily evidence express preemption, several have found that the TCPA does give rise to *implied* preemption "where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress." *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986). Notably, "[p]re-emption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation." *Id.* The TCPA authorizes the FCC to "prescribe regulations to implement the requirements of this subsection," *i.e.*, 47 U.S.C. § 227(b), which regulates the use of an ATDS. 47 U.S.C. § 227(b)(2). And the FCC has done so. *See* 47 C.F.R. § 64.1200(a). In the exercise of that authority, the FCC issued an order detailing its position as to how the TCPA establishes the FCC's ability to preempt state law:

> With limited exceptions, the TCPA specifically prohibits the preemption of any state law that imposes more restrictive intrastate requirements or regulations. Section 227(e)(1) further limits the Commission's ability to preempt any state law that prohibits certain telemarketing activities, including the making of telephone solicitations. This provision is ambiguous, however, as to whether this prohibition applies both to intrastate and interstate calls, and is silent on the issue of whether state law that imposes more restrictive regulations on interstate telemarketing calls may be preempted. ***As set forth below, however, we caution that more restrictive state efforts to regulate interstate calling would almost certainly conflict with our rules***.
>
> We recognize that states traditionally have had jurisdiction over only intrastate calls, while the Commission has had jurisdiction over interstate calls. Here, Congress enacted section 227 and amended section 2(b) to give the Commission jurisdiction over both interstate and intrastate telemarketing calls. Congress did so based upon the concern that states lack jurisdiction over interstate calls. ***Although section 227(e) gives states authority to impose more restrictive intrastate regulations, we believe that it was the clear intent of Congress generally to promote a uniform regulatory scheme under which telemarketers would not be subject to multiple, conflicting regulations***. We conclude that inconsistent interstate rules frustrate the federal objective of creating uniform national rules, to avoid burdensome compliance costs for telemarketers and potential consumer confusion. The record in this proceeding supports the finding that application of inconsistent rules for those that telemarket on a nationwide or

multi-state basis creates a substantial compliance burden for those entities.

> ***We therefore believe that any state regulation of interstate telemarketing calls that differs from our rules almost certainly would conflict with and frustrate the federal scheme and almost certainly would be preempted***. We will consider any alleged conflicts between state and federal requirements and the need for preemption on a case-by-case basis. Accordingly, any party that believes a state law is inconsistent with section 227 or our rules may seek a declaratory ruling from the Commission. We reiterate the interest in uniformity - as recognized by Congress - and encourage states to avoid subjecting telemarketers to inconsistent rules.

*In Re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14063-65 (2003) (emphases added).

The FCC's determination of the preemptive effects of the TCPA and its regulations, including those governing the use of an ATDS, is significant. "Federal regulations have no less pre-emptive effect than federal statutes. Where Congress has directed an administrator to exercise his discretion, his judgments are subject to judicial review only to determine whether he has exceeded his statutory authority or acted arbitrarily." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153-54 (1982). *See also Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 700 (1984) (same). The FCC's determination that its regulations preempt conflicting state laws in furtherance of Congress's intent to promote a uniform regulatory scheme for telemarketing is neither *ultra vires* nor arbitrary. Indeed, consistent with – and, sometimes, directly because of – the FCC's determination, several courts have found conflicting state laws that regulate interstate telemarketing are preempted by the TCPA.[8]

This court should find the same with Section 8(a) of the FTSA. To the extent an

[8] *See Teltech Sys., Inc. v. Bryant*, 702 F.3d 232, 239 (5th Cir. 2012) (finding state law that more strictly prohibited spoofing of a caller ID number, even when done without "intent to defraud, cause harm, or wrongfully obtain anything of value," frustrated federal objective in TCPA to protect non-harmful spoofing and was therefore conflict preempted); *Charvat v. Telelytics, LLC*, No. 05AP-1279, 2006 WL 2574019, *9-10 (Ohio Ct. App. Aug. 31, 2006) (holding state law requiring telemarketer to state the call is to make a sale, when the TCPA does not require such disclosure, was an impermissible more restrictive regulation on interstate telemarketing and, per the FCC's position, was preempted); *Chamber of Com. of U.S. v. Lockyer*, No. 2:05-CV-2257MCEKJM, 2006 WL 462482, *8 (E.D. Cal. Feb. 27, 2006) ("SB 833 stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress because it eliminates the established business relationship exception that Congress expressly codified in the [TCPA] and nullifies Congress' decision that unsolicited facsimile advertisements be governed by an "opt-out" rather than an "opt-in" scheme.").

"automated system for the selection or dialing of telephone numbers" is *not* the same as an ATDS – a situation made unclear by the abject vagueness of the language – Section 8(a) creates a competing and conflicting regulatory scheme. At one point, federal courts were of the view that the TCPA's definition of an ATDS could "include devices which automatically call numbers from a pre-programmed list, and 'predictive dialers,' which automatically call numbers from a list and automatically connect the calls with an available agent." *Ramos v. Hopele of Fort Lauderdale, LLC*, 334 F. Supp. 3d 1262, 1273 (S.D. Fla. 2018) (quoting *Pozo v. Stellar Recovery Collection Agency, Inc*., No. 8-15-cv-929-T-AEP, 2016 WL 7851415, *3 (M.D. Fla. Sept. 2, 2016)). Section 8(a)'s focus on an "automated system for the selection or dialing of telephone numbers" certainly leaves open the risk of a similarly broad scope.

The Supreme Court's recent, unanimous decision in *Facebook v. Duguid*, 141 S. Ct. 1163 (2021), however, rejected that reading. The Supreme Court confirmed that "Congress' definition of an autodialer requires that in all cases, whether storing or producing numbers to be called, the equipment in question must use a random or sequential number generator." *Id.* at 1170. Consequently, dialers that merely call numbers – even automatically – from a pre-programmed list, as well as predictive dialers, are not prohibited under the TCPA. The *Facebook* decision was issued on April 1, 2021, before the amendments to the FTSA were enacted in June 2021. While the legislative history acknowledges the *Facebook* ruling and remarks that it "limits the TCPA's regulations to the now obsolete sequential number dialer style of autodialer, versus the predictive dialing technology that most businesses use today," (Ex. C at 3), there is no express statement that Section 8(a) is intended to apply more broadly than the TCPA. If so, that would impose a more restrictive regulation that conflicts with and runs directly afoul of the uniform regulatory scheme of the use of autodialers in telemarketing that the FCC has ruled was Congress's intention. *Cf. Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95 (1983) (New York statute was preempted to the extent it prohibited practices that were lawful under federal law). The FCC's determination that state laws should not conflict with the uniform regulatory scheme intended by Congress is neither arbitrary nor outside of the FCC's authority. The TCPA and its regulations therefore preempt Section 8(a)'s conflicting regulation of autodialers.

## II. EVEN IF SECTION 8(A) IS NOT UNCONSTITUTIONAL, PLAINTIFF FAILS TO STATE A CLAIM FOR RELIEF

In the event the Court does not dismiss the Complaint on the ground that Section 8(a) of

the FTSA is unconstitutional, dismissal is still appropriate under Rule 12(b)(6) as the Complaint fails to state a plausible claim for relief.

**A. The Complaint Does Not Plausibly Allege that Section 8(a) Was Violated**

In alleging a violation of Section 8(a), the only relevant conduct by USHA that Plaintiff alleges is that "[t]o transmit the above telephonic sales text message calls, Defendant utilized a computer software system that automatically selected and dialed Plaintiff's and the Class members' telephone numbers." Compl. at ¶ 17. *See also id.* ¶ 54 ("Defendant made and/or knowingly allowed the telephonic sales calls to Plaintiff and the Class members to be made utilizing an automated system for the selection or dialing of telephone numbers."). That language simply parrots the relevant language of Fla. Stat. § 501.059(8)(a), which is not enough to state a plausible claim. *See Iqbal*, 556 U.S. at 678. Indeed, the Middle District of Florida recently ruled that ***the same*** allegations are insufficient:

> To properly allege a violation of this provision, a plaintiff must allege some facts making it plausible that the defendant used an automated dialing system as described by the statute. Here, Davis could have pleaded facts such as information on [the defendant's] website indicating that messages are sent through automated systems, information regarding the formality of the message, or information regarding the phone number from which the message was received that could indicate an automated source. Instead, Davis alleges merely that "[t]o transmit the above telephonic sales calls, Defendant utilized a computer software system that automatically selected and dialed Plaintiff's and the Class members' telephone numbers." (Doc. 18 ¶ 18.)
>
> This allegation is conclusory and the Court need not accept it as true. . . . The fact that Coast Dental sent Davis an unsolicited text message is consistent with the idea that Coast Dental used an automated machine to send advertisements *en masse*. ***However, these facts are also consistent with Coast Dental hiring a marketing firm to send individual messages from a personal cell phone in full compliance with the FTSA***. From the facts pleaded, it is merely possible that Coast Dental violated the FTSA, but not plausible as the pleading standard requires. *See Iqbal*, 556 U.S. at 679. Without more, Davis's FTSA claim fails.

*Davis v. Coast Dental Servs., LLC*, No. 8:22-CV-941-KKM-TGW, 2022 WL 4217141, *2 (M.D. Fla. Sept. 13, 2022) (emphasis added).

The Complaint here is similarly devoid of facts plausibly suggesting the use of an automated system. Plaintiff identifies only four text messages in the span of six or seven months. *See* Compl. at ¶ 11. Despite referring to the messages as "impersonal and generic," all but one refer to Plaintiff by his first name and all include the first name of the insurance advisor

who sent the message (Jack or Bryan), and only two are identical. *See id.* Regardless, as numerous courts have found with respect to the alleged use of an ATDS, and as the court in *Davis* found for an FTSA claim, the occurrence of four text messages in six or seven months fails to plausibly suggest the use of an automated system as opposed to permissible types of dialing equipment (or manual texting by the independent insurance advisors).[9] Plaintiff has failed to state a plausible claim that an automated system for the selection or dialing of his number was used.

### B. Dismissal is Required if an "Automated System" Is the Same as an ATDS

In the event the Court determines that Section 8(a)'s reference to an "automated system for the selection or dialing of telephone numbers" is – or must be – coextensive with the definition of an ATDS under the TCPA, then dismissal is required because Plaintiff fails to plausibly allege that the dialing system that called him "use[d] a random or sequential number generator." *Facebook*, 141 S. Ct. at 1170. Indeed, he alleges that USHA's equipment "select[s] and dial[s] numbers automatically from a list of numbers," (Compl. at ¶ 22), the antithesis of an ATDS, which must randomly or sequentially generate telephone numbers. *See*, *e.g.*, *Garry v. NewRez, LLC*, No. 8:20-CV-2451-KKM-AEP, 2022 WL 1619592, *7 (M.D. Fla. Mar. 7, 2022) ("Phone systems that are capable of making telephone calls only to specific telephone numbers from dialing lists provided by consumers do not qualify as ATDS systems under *Facebook*'s definition.").

## CONCLUSION

For all the foregoing reasons, the Court should issue an Order dismissing with prejudice Plaintiff Stephen Muccio's Complaint, and for such other relief deemed just and proper.

---

[9] *See Nakai v. Charter Commc'ns, Inc.*, No. CV 19-8035-GW-SSX, 2020 WL 1908949, *5 (C.D. Cal. Apr. 15, 2020) (declining to find that the "alleged five calls within a twelve-day period [are] sufficient to state a plausible claim"); *Sepehry-Fard v. MB Fin. Servs.*, No. 13-cv-02784-BLF, 2014 WL 2191194, *3 (N.D. Cal. May 23, 2014) (finding fourteen calls within a week "fail[ed] to support an inference that the calls were generated by an ATDS"); *Rhinehart v. Diversified Cent., Inc.*, No. 4:17-CV-624-VEH, 2018 WL 372312, *8 (N.D. Ala. Jan. 11, 2018) ("[D]espite the fact that she sets out several dates and times on which calls were made to her" – thirty-four calls in just over two months – "the Plaintiff has alleged no facts which plausibly establish that such calls were made using an 'automatic telephone dialing system' other than the bare allegations that such a system was used.").

Dated: September 28, 2022

Respectfully submitted,

By: /s/ Jeffrey A. Backman

JEFFREY A. BACKMAN
Florida Bar No. 662501
ROY TAUB
Florida Bar No. 116263
200 E. Broward Blvd., Suite 1800
Ft. Lauderdale, FL 33301
(954) 491-1120
jeffrey.backman@gmlaw.com
jessica.serrano-cartagena@gmlaw.com
roy.taub@gmlaw.com
cheryl.cochran@gmlaw.com

*Attorneys for Defendant*
*USHEALTH Advisors, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 28, 2022, a true and correct copy of the foregoing document was electronically filed on the Court's CM/ECF system, which forwards a copy to all counsel of record.

By: /s/ Jeffrey A. Backman
JEFFREY A. BACKMAN